Could we call the first case, please? Would the attorneys presenting the argument please approach? Introduce yourselves for the record. If you could spell your last name, please. My name is Harold Hirschman, H-I-R-S-H-M-A-N. And you are representing for the record? I am representing Mr. Oliver. Okay. Good morning. Good morning. Harvey Barnett, B-A-R-N-E-T-T. I represent the Apple League combined and all. All right, Mr. Barnett. Thank you. Good morning. Good morning. We, first of all, appreciate you accommodating our change of schedule on late notice. Thank you. We're on a bit of a tight schedule ourselves. We're going to hold you to 15 minutes aside. Mr. Hirschman, I assume you'd like a couple minutes for rebuttal? I do, Your Honor. I thought I would take 10 minutes and open at five minutes. Very good. All right, Mr. Barnett, you can have a seat. And, Mr. Hirschman, you have the floor. Certainly. Your Honor, I'm sure appreciate, given the length of the judge's opinion, that what we're dealing with is a business that was actually structured intentionally as two separate entities. One was a limited liability corporation, and that was combined, and that was the entity that actually sent people out to represent manufacturers with respect to products. And it was an LLC, and this Court has addressed the fiduciary responsibilities in an LLC in the 800 Southwells case. So, Mr. Hirschman, let me interrupt you if I could. I want to talk about your client, Mr. Oliver. Sure. And I want to identify exactly what role he had in each of these companies, but particularly with regard to combined. Certainly. Okay. So the trial court called him at one point a manager slash officer. At another point, he called him an agent slash employee. What was he? What did the evidence show? The evidence showed that he was not an employee directly, except he did get paid through combined. He worked his accounts through combined. He wasn't called an employee, but he did get paid as an employee. He got a 1099 or something like that. Did he get a W-2 or a 1099? You know, I'm not sure. It's in the record. The trial court said that he received a salary from combined and he was therefore an employee. He Do we have a basis for overturning that judgment? No. We don't have a basis for that. The way it worked, there was a the managers came together, and that would be Gleason, Eisenberg and Mr. Oliver, as the designated  No. The manager was the entity. And that is specifically a part of the underlying documentation. Each of the individuals was not designated a manager.  So CHG, the corporate entity, was the only manager? That is correct. Okay. Was he an officer of combined? He was not an officer of combined. Were there any officers of combined? I do not believe so. I don't believe there's any evidence in the record that there was an officer of combined. Okay. The So when the trial court said he was an employee, do you think that was the correct characterization of him? I think so. I mean, I don't remember the testimony directly on that point. But as close as you come, he was not a member of combined, as were all of the others except Gleason, Eisenberg and Oliver. CHG was a member, right? CHG itself. 51% of shares. Correct. Absolutely. And there we think the court, the trial court made a significant error of law because it ignored the corporate structure. It ignored the fiduciary duties which limited liability corporations actually under the statute were intended to permit a different kind of structure with different kinds of fiduciary duties. And the statute itself was clear that the fiduciary duty in that kind of entity is the manager's responsibility and not the individual. Well, you can't have an individual manager as an 800, but they did not have that in this case. And so to equate the fiduciary duties of a limited, of a closely held corporation to the LLC is on its face legal error. Okay. Let's talk about CHG. What positions did he hold with CHG? In CHG, he was the tax — he was responsible for taxes. And — Was he the treasurer? Do I have that right? I don't think so. I think — I assume that Mr. Gleason was the treasurer because he was the one who computed salaries and was responsible — I thought he was the treasurer. But would you agree that he was an officer? Yes. Okay. So he owed a fiduciary duty to CHG as an officer? He owed a fiduciary duty to CHG as an officer. And as a shareholder? And as a — well, in a closely held corporation, the three of them owed each other a very high level of fiduciary duty comparable to a partnership. Yeah. But that ceased when he ceased to be a shareholder. And that was as the court held on December 31st of 2012. Was he also a director of CHG? I thought I saw him — The three of them had a shareholders' meeting each year where they went over and then they ratified the acts. Yes, he was a director because he was removed as a director in January of 2013. Late January, though, not the first of January. Not the first of January. So on January 1, 2013, when he transitions out of the company, to say that loosely, he's still a director. He was still a director. Okay. Although he was not a shareholder. So while he was soliciting clients away from combined, he was still a director of CHG? Yes. But CHG's business was totally and only limited to one thing, and that is managing combined. And with respect to his solicitation, the court specifically — Well, it was managing and owning combined, right? It had 51 percent ownership. It had 51 percent ownership, but — And that was its sole asset, right? And that was its sole asset, absolutely. Okay. But — Does it matter with respect to his position as an officer what they were managing, whether, you know, the scope of what they were, in fact, managing? Does that matter in terms of the position that he held with respect to CHG? Yes, because what he's accused of in the brief for fiduciary duty is soliciting clients. The holding company had no clients. And the only entity with clients was combined. And combined understood that a former employee could compete, which is black letter Illinois law. And how did they protect themselves?  And the covenant not to compete itself is overbroad. So you wouldn't have a covenant, you wouldn't even need a covenant, if it was axiomatic that a former employee, such as Mr. Oliver, couldn't try to compete. And so — and there is nothing, there are no covenants not to compete in the holding company. There are no obligations in the holding company with respect to how he should conduct his business. That was down in — I'm sorry, in combined. CHG deprived part of his income from combined, correct? CHG, yes. So as a director, if he did something which would adversely affect the income, wouldn't that be a constituted breach? No, because of two things. First of all, the managers of combined knew that he was intending to go and compete. And as the Court said, there's a remarkable admission that despite knowing this, they didn't do anything. They didn't notify him. They didn't do anything. Not right away. What? Not at first. Not until after they already knew he had switched all his customers at the end of January. They had no new knowledge at the end of January. And if we look at the three of them, and if Your Honor says, well, the fiduciary duty as director somehow precluded him from contacting the customers, then the actions of his co-directors also have to come into play. And you have to say, was this entire fairness on their part when they knew what he was doing, they knew instantly, and they chose to let him do it and wait and then sue him? And what is the result of all of this? If you look at the whole picture, Oliver owned something. Well, I mean, that may be relevant to whether there was a breach of the fiduciary duty, and it might be relevant to the damages, but it's not relevant to the existence of the fiduciary duty. I mean, what I hear you saying is CHG suffered no loss here. And I think Justice House said what actually came to my mind as well. CHG wasn't just the manager of Combined. They owned it. They were the 51 percent owner. They gave up some of the shares over the years to entice other sales reps to come, like Herman and Short. But they owned it, and that was their money. That's the only way CHG made money was from Combined. So if Combined gets hurt, they get hurt, right? Well, there's two aspects of that.  On the other hand, up until the 31st, Mr. Oliver owned one-third of that income stream. And after the 31st, according to the Court's decision, he lost all rights to that income stream. So the 51 percent was now owned by the other two guys. Sure. And he gets, if their theory is correct, nothing. And then we are in a situation where there is a forfeiture, because he starts out on the 30th with 15 percent of the entire enterprise, including the $2 million that are represented by SalesLink. And like that, he loses everything and, if they're correct, has to pay them $627,000 more. I think we have to call you at your 10 minutes. Okay. Five more minutes to rebuttal? Yes. Thank you, Your Honor. Of course. Mr. Barnett. May it please the Court? I'd like to address in 15 minutes two specific issues. The first one is a dispositive issue, which is the restrictive covenant, and the second one is the one you were just, Mr. Hirschman was talking about, is the breach of fiduciary duty issue.  The dispositive issue, which the lower court erred on, was in holding that this restrictive covenant was unenforceable. And we cited case law, which Oliver could not respond to, and specifically the Hoff v. Meyer case and the Bortek case, which is a New Jersey Supreme Court case, which draws the distinction between a normal employment restrictive covenant and a retirement restrictive covenant, which we always took the position this was. So under this restrictive covenant, Mr. Oliver had a choice. He could get $1,050,000, which the court awarded him because the court held it was unenforceable, or Judge Mullen found that he in turn breached his fiduciary duty. We acknowledge that if the covenant is held to be valid and he forfeits the $1,050,000, we don't get the damages for breach of fiduciary duty. As I said, Mr. Oliver can't have his cake and eat it too. Right. Neither can we. What's sauce for the goose? So the retirement provision gave Mr. Oliver a choice. He could retire and receive over $1 million in benefits over a five-year period and not compete with Combined, or he could compete with them, which he did by taking the Ace Hardware lines he represented on behalf of Combined and then Combined would cease paying the retirement benefits when he did so. The choice was his. That's exactly what they said in the Hoff case with respect to Mr. Hoff, the attorney who left Mayor Brown, who wanted to compete and take his clients. The court said a former partner is free to practice law and clients are not restricted in their choice of counsel. The plan gives the retired partner the choice between continuing to practice law and receiving retirement benefits. Can't have your cake and eat it too. They haven't responded to that. They have no response to that. And the case law demonstrates the reason why this is a distinction between the employee cases. In a typical employee case, as this Court well knows, the covenant imposes a hardship on the employee, a potential hardship. Can't work. And it may hurt the public by lessening competition. That's not present in the retirement setting. The opposite happens. As stated in Hoff and Bortek, the covenant protects the goodwill of the company, in this instance Combined, and the records show that Combined spent millions of dollars to create this goodwill. The accounts of Combined are still serviced. Commissions are still paid. And the retiring partner gets compensated for his years of service. And very significantly, just as in Hoff and in Bortek, a good portion of that retirement pay comes out of the accounts that that retiring partner had, which is used to then help to pay for the retirement. And here, now, in this instance, although the court said this was a blanket prohibition on Oliver, it wasn't. What we believe the court overlooked was the definition of the word aspects of the businesses testified to by the parties. Both Mr. Oliver and Richard Eisenberg testified under oath that when the restrictive covenant referred to the aspects of the business, it was only referring to the four different distinct areas in which they functioned. And so to cut to the chase. But that's not what it says, though. I mean, it could have said that pretty easily. It says. But it says the company's business as described in Section 2.4. Right. Section 2.4 says we're a sales rep. Right. And it might do something else later. No, you're not. No, no, no. I'm saying it says we're a sales rep now, and we reserve the right to engage in any other venture or undertaking. Right. As developed from time to time, it says. It says we're a sales rep. But that's a general description of who they are. But where it says anyone in the United States engages in any aspect of the company's business, the question is what's the aspect of the company's business? And so both parties testified. There was no dispute. There were only four areas. And we believe a fair reading of that means that Mr. Oliver not only could get his income, but he could compete in those four aspects. And so once you're a salesman, you're always a salesman. If he wanted to pick up a line in the clothing and sell lattes through his Ace accounts or toys or candy or any other kinds of things we all find in an Ace store that's not one of those four, one of which is hardware, he was free to supplement his income by doing so. Now, let me ask you about the same question I asked Mr. Hirschman about Mr. Oliver's status. Your position is he was a manager? He was. He was an officer of the manager. The manager was CHG. The manager was a corporate, closed corporation, CHG. So you don't think Oliver individually was a manager? No. Oliver was an officer of the manager. Right. And I don't want to split hairs. No, no. He was an officer of the manager. We aren't splitting hairs here. He was director of the manager. He was an agent of the manager. Or was he the manager himself? No, the manager was an entity, the closed corporation entity. So what was his relationship to Combine? What role, officially, if there is one, did he have with Combine? Well, he also was an employee, okay? And as part of that management team, as Mr. Hirschman acknowledged, at the end of the year, they managed the business of Combine. But at the end of the year, specifically, they all got together. I understand. And they decided who was going to get what, et cetera. They signed ratifications at the end of the year, ratifying all the actions. The result that they're asking for, to cut to the bottom line again, is that if you have a closed corporation, like a CHG, who's the manager, then that, any one of the officers of that manager could literally leave and take the clients of that company, the accounts, with impunity and simply point back and say, well, that's a corporate entity. But we all know corporate entities only function through their officers and directors. Okay, but let's talk about Combine's breach of fiduciary duty claim. Combine's, not CHG's. Yes. When you determine the existence of fiduciary duty, the first thing you have to look at is, well, what role did you have? Were you the janitor of the company? Were you the CEO? Were you the head of the board of directors? So my question to you is, what was Oliver's relationship to Combine? Oliver was an employee. Is that it? Yeah. Well, he was an employee. He wasn't an officer. I saw nothing of that. No, because it was managed by this entity, and he was an officer of that entity. Okay, but let's stick with Combine. He was not, I mean, Combine could have, their operating agreement allowed them to elect officers or appoint officers. But as far as I can tell, they didn't. That's correct. Okay, there was no officer of, he wasn't an officer of Combine individually. He was not the manager of Combine. He was the employee. He was an employee of Combine, yes. Okay. Yes. And you think the evidence showed that he breached his fiduciary duty as an employee? Absolutely. And how is that? Well, in several respects. First of all. The case log gives a fair amount of leeway to employees, right, compared to officers and chairmen. But I don't, and our view is, and I think in Judge Mullins, his fiduciary obligations vis-a-vis CHG was to protect the only asset of that entity. And that entity was the managing Combine. And so he could, with impunity, walk, decide. Are you talking about piercing the corporate veil? Pardon me? Are you talking about piercing the corporate veil of CHG? I'm not sure if I'm saying it that way, Your Honor. Perhaps it's that. But he had obligations under the law, both under the LLC Act, to protect the entity, the very assets. And so he can't walk off with those assets under any one of these theories. And he did so. But there were two different entities that sued Oliver for breach of fiduciary duty. One of them was Combine. The other was CHG. Yes. I'm just talking about Combine right now. I understand. The only fiduciary duty he owed to Combine was as an employee, right? Sounds like that's what you're saying. I must disagree. I think he owed a fiduciary duty to Combine as an officer and effectively one of the managers of CHG. Okay. I think clearly. So how did he breach it? As Judge Munger found, we've got all the background. He was the founder. He, Combine, had spent millions of dollars on his goodwill. Oliver had unique knowledge of who the accounts were, particularly the Ace accounts. He kept the contracts. He knew exactly who to contact, when to contact, et cetera. And those were the so-called bad acts that started before the actual date that they're saying, which case law says that date isn't necessarily written in stone. But before that date, before December 31, he planned to leave with Short and Herman and take the Ace accounts, absolutely on the record. In fact, he testified he had a handshake deal with them to take those accounts and was obliged to do so, which was Judge Munger found to be shocking. There's no question that Mr. Oliver was starting to prepare to leave. There's no question about that. I mean, he was talking with Herman and Short. I think all of them. Oliver testified to that. And more than just. But if you were just an employee, if that were the only fiduciary duty that he owed to Combine was as an employee, would that be a breach of an employee's fiduciary duty? I think under the circumstances that are described here, it would be. The cases they cite, I call them the clean break cases. Someone says, you know, I'm going to leave. I won't talk to a client. I'm going to go out on my own, which is like one of the cases that they cite. That's what happened here. He was dealing with, scheming with Short and Herman, making deals with them. And as he said, I had a handshake deal with them before December 31. I'm going to leave. And then what did he do? On January 2, he admits, two days in, he admits he calls all of his accounts and solicits all of those accounts and within one week secures all of them for this nonexistent entity's signature. And I know it's a very voluminous record, but I would really ask the Court, not right now, but take a look at Exhibit 42. Trial Exhibit 42. Because those are the e-mails that Judge Logan pointed out. That e-mail was January 9th, right? That e-mail was January 9th, but he admitted, it says right on it, as we discussed. Yeah, but the judge said he didn't start soliciting clients until after January 1. He said he took January 1 off, right, and then he started making phone calls on January 2nd. He said he believed that. No, you've got the record right. Okay, so. But that was the actual solicitation, the preparations for that and the so-called obligation. On that same day of January 2nd, a very interesting thing happened. That's the day that he received a copy of the settlement agreement that was drafted by Short and Herman's lawyers, five pages filled with all kinds of clauses, et cetera, things that they were going to take, sales link, multimillion dollar, et cetera. So he knew there was no deal. He knew there had been no deal. The judge said that. So on that same day, he's going back to the choice. He could have said, you know what, there's no deal, I'll retire, I'll take my $1,050,000, but he didn't. Because why? He claimed he had a handshake deal with them and was obligated to go out and solicit these clients. And this doctor. It sounds like he was a little bit worried that he wasn't going to get his $1,050,000, though, too, right? I'm not sure he saw that as that. He claimed that was his claim in the case. The record shows that there was more than sufficient funds to pay him $200,000 every year, to pay out over five years. It was more than that. And, again, Your Honor, this document, like two minutes, this document has four lies in it, okay? And you'll see what they are. One, it represents there was a reorganization of combined nonsense. Two, he says that the hardware division is separating to be called Signature. There was no separation. No one had agreed on anything. He knew that. He said a decision was made to, why was all this happening? To transfer more assets to work on our sales link division. There was no such, a total misrepresentation to these accounts, to these clients, to these clients. And, again, this document, like two minutes, this document has four lies in it, okay? And you'll see what they are. One, it represents there was a reorganization of combined nonsense. Two, he says that the hardware division is separating to be called Signature.  No one had agreed on anything. And, again, this document has four lies in it, okay? which specifically provide and authorize, in a retirement situation, that you can forfeit your retirement benefits. There is no such provision in the Illinois law elsewhere. And so those cases just have nothing to do with the kind of situation we're in. So let me ask you this. Sure. The trial court, there didn't seem to be a whole lot of evidence of what Mr. Oliver was doing with the clients. He might have been talking to Herman and Short, but with his clients, before January 1. He sends that January 9th email. He admitted under oath that he started calling on the 2nd. On the 9th, he says, as we discussed. There's no evidence that he solicited the clients before January 1. But the judge, in finding a breach of productionary duty, said it's hard to believe he could have converted the clients that quickly, that he must have been somehow greasing the wheels with these guys. You know, police said, I don't see how he could have done it so quickly. Is that a reasonable inference? No. We're on a manifest weight standard here. We didn't try this case. The judge admittedly didn't have a lot of hard evidence, but said that seems like a reasonable inference. First of all, I don't remember the judge saying it was a reasonable inference that he started beforehand. He said he must have. Well, I'll accept. But they had Mr. Oliver on the stand. Mr. Oliver was admitted what he did. They didn't ask him the simple question, did you start before? They asked other people that question. I think that's just a failure of proof. And to infer bad faith on Mr. Oliver without obviously obtainable evidence I think is not an appropriate inference on this record. Okay. My next question. Sure. Because we're tight here. An employee's fiduciary duty. You are. I think you're right. It's an easier, it's a looser fiduciary duty than an officer would have. Can an employee talk to other employees in the company about leaving before? Yes. The Ellis case says he can. Besides that, that was completely known to Gleason and Eisenberg. They were told that this was the plan. They weren't told by Oliver, but they were told if there was an amicable separation, he would go with them. If they hadn't been told and he did it secretively, would that be a breach of fiduciary duty? No, I don't think so. I don't think there's a case that says that simply. As a matter of fact, I believe the case law is that you are allowed to plan to leave and establish even a corporate shell so that you can go there. And in the Ellis case, where there was almost a similar structure and a similar situation, they, he solicited, he's no relative, I assume. He told his clients he was going to leave. Right. Period. He didn't say come with me. Right. He said I'm leaving. And the court said that wasn't enough. Right. And there's no evidence that Oliver even did that. Right. I think the case law does say you can start getting ready. You can start putting out your stationary. You can get a lease. You can build the building if you want to. You can print out your solicitations. But you can't solicit before you leave. And so I'm asking if you are conspiring or whatever you want to call it with other employees to leave, does that cross the line or not? No, because he didn't, the court specifically found he wasn't conspiring. Bad choice of words. But if you're, but he was definitely talking to Herman and Schork about it. There's no doubt about it. Right. You know, it was open. Can an employee do that without breaching his fiduciary? Yes. There is no case that I know of that says an employee can't talk to another employee. Do you know of a case that addresses this? Because I don't think Ellis addressed that. I don't think I've seen a case that addresses that. But there's a lot of them out there I may have missed. Yeah, I mean, I'm just trying to think about, I can't think. Maybe Smith Schrader. You guys both. Yeah. Okay. You've got a couple minutes. I've been talking. That's okay. But, you know, the, I think what's, Your Honor, is clearly on top of the record. But I believe that, for instance, that email that Mr. Bynum was talking about, he says that came on combined from combined's email. It didn't. So. What do you mean it didn't? Of course it didn't. No, no. The email address was from Mark Oliver's own email, not from combined. Are you sure about that? Yes. And we cited it in the record. Okay. That's not my memory. But we'll look at it. Yeah. So, I mean, what. Do you think it was proper for him to represent to all of his former clients, hopefully new clients at Signature, that a deal had already been struck when he didn't really have reason to believe it had been struck yet? I guess the question would be whether they felt, whether they felt that a misrepresentation had been made to them and whether they felt that they were fooled. And I think the answer to that is that it was Mr. Oliver who they wanted to work with. And when he called and said, I'm working with Signature, a new entity, that was the critical thing. It wasn't the, you know, it wasn't anything about how it came to be that he was making these calls. And, again, there was no evidence of any of Mr. Oliver's clients and their attitudes and views. That was obviously available in discovery. It was not put into the record. So. I think we need to wrap up. Yeah. I was just about to. Okay. Anyway, so we have a situation where the fiduciary duty that the Court acknowledged, you know, what kind of fiduciary duty is owed by a former person is a difficult question. He called it one way. We think he called it wrong. But I do not believe directors are obliged not to compete. I don't think there's law to that effect because there are directors who are in all kinds of corporations, which aspects of which in their own corporations compete with the ones they're in. So just being a director is insufficient. Thank you, Your Honor. Thank you very much. Thank you both. Your briefs were excellent. Your argument was as well. It's a difficult case. We take it under advisement, stand in recess, and switch the panel for the next case. Thank you.